**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CATHERINE ANN PORCELLI, | CASE NO. 1:14-cv-01156-CCC-GBC |
| Plaintiff, | (CHIEF JUDGE CONNER) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S APPEAL |
| Defendant. | Docs. 1, 12, 13, 17, 18, 20 |

## REPORT AND RECOMMENDATION

### I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Catherine Ann Porcelli for disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). Plaintiff asserts disability as a result of mental impairments, but both her treating physician and the state agency physician opined that she retained the ability to perform satisfactorily despite some mental limitations. She was briefly hospitalized in May and June of 2011 after stopping her medications, but from September of 2011 through the ALJ decision on November 2, 2012, she resumed her medications, had normal mental status examinations except for occasional mild depressed and anxious mood, and had global assessment of functioning scores that ranged from 55 to 60, indicating

moderate symptoms at worst. She also asserts disability as a result of back and musculoskeletal pain. However, her physical examinations were generally normal, and imaging studies indicated only minimal abnormalities. Her treating physician opined that her disc disease was very mild and recommended weaning off of narcotics and using more conservative treatments, like anti-inflammatory and over-the-counter medication. She testified that she could lift up to twenty pounds and sit or stand for a couple of hours each at a time. Thus, the ALJ properly concluded that Plaintiff could perform a range of simple, light work. For the foregoing reasons, the Court recommends that Plaintiff's appeal be denied, the decision of the Commissioner be affirmed, and the case closed.

## II.    Procedural Background

On August 2, 2011, Plaintiff filed an application for DIB under the Act. (Tr. 122-36). On October 12, 2011, the Bureau of Disability Determination denied this application, (Tr. 53-67) and Plaintiff filed a request for a hearing on November 7, 2011. (Tr. 68-69). On October 15, 2012, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 28-52). On November 2, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 13-27). On December 26, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 12), which the Appeals Council denied on March 20, 2014, thereby affirming the decision of the ALJ as

the "final decision" of the Commissioner. (Tr. 7-11).

On June 16, 2014, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On August 25, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 12, 13). On October 9, 2014, Plaintiff filed a brief in support of her appeal ("Pl. Brief"). (Doc. 17). On November 13, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 18). On November 24, 2012, Plaintiff filed a brief in reply ("Pl. Reply"). (Doc. 20). On June 23, 2015, the case was referred to the undersigned Magistrate Judge.

### III.    Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In other words, substantial evidence requires "more than a mere scintilla" but is "less than a preponderance." *Jesurum v. Sec'y*

*of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing

*Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### IV. Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must

demonstrate an "inability to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. §

1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that

he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national economy,
> regardless of whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for him, or whether
> he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a

person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also*

*Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds

that a Plaintiff is disabled or not disabled at any point in the sequence, review does

not proceed. *See* 20 C.F.R. § 404.1520. The Commissioner must sequentially

determine: (1) whether the claimant is engaged in substantial gainful activity; (2)

whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").   20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a). Specifically, the Act provides that:

> An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require. An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or

psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability.

42 U.S.C. § 423(d)(5)(A); 42 U.S.C.A. § 1382c(a)(3)(H)(i) ("In making determinations with respect to disability under [the SSI] subchapter, the provisions of sections 421(h), 421(k), and 423(d)(5) shall apply in the same manner as they apply to determinations of disability under subchapter II of this chapter").

### V. Relevant Facts in the Record

Plaintiff was born on June 17, 1958 and was classified by the Regulations as a person closely approaching advanced age through the date of the ALJ decision. (Tr. 25). 20 C.F.R. § 404.1563. Plaintiff has at least a high school education and past relevant work as a certified nursing assistant and restaurant manager. (Tr. 25).

On January 7, 2010, Plaintiff presented to Dr. Jennifer Snavely, D.O., as a new primary care patient. (Tr. 260-61). She had recently moved into the area. (Tr. 260). She reported that she had previously seen a neurosurgeon "for her back which has been a problem for at least two years…she has disc bulges and was sent to [physical therapy] which only help a small amount." (Tr. 260). She reported that she had fallen down some steps about six weeks earlier and that her pain had been getting progressively worse. (Tr. 260). She reported that her left "leg gets numb

and she has a pins and needles sensation." (Tr. 260). She reported that constant pain in her back made her "go on light duty at her job (nurses aid)." (Tr. 260). She indicated that she is "out of Adderall and would like a refill on that…only takes it as needed when she feels she cannot concentrate..would also like a refill on Vicodin which she has been on for over a year…states she only takes it as needed and does not abuse it…never take[s] Adderall and Vicodin at the same time." (Tr. 260). She "denie[d] anxiety and depression." (Tr. 260). On examination, Plaintiff "walk[ed] with a normal gait," her motor strength was "intact," had normal muscle tone, and a positive straight leg raise test. (Tr. 261). She had "no apparent anxiety, depression, or agitation" and her affect was "normal." (Tr. 261).

Dr. Snavely assessed Plaintiff to have unspecified backache and prescribed baclofen and naproxen. (Tr. 261). She "explained from her most recent MRI her disc disease is very mild and unless things have changed since her recent fall I am not sure any type of surgical intervention is necessary." (Tr. 261). She "discussed [how] long term narcotics are often not indicated and we need to have her on more conservative treatments such as muscle relaxers and NSAIDs." (Tr. 261). She requested a "note for work but since she is on part time she really only needs to work one day in 4 months so she does not need a note…at this time." (Tr. 261). She indicated that they would "wait on [an evaluation] by Dr. Moore to determine the extent of the disease at this time." (Tr. 261). She also assessed Plaintiff to have

generalized anxiety disorder, and indicated that she had "recently been given a refill on Xanax." (Tr. 261). She diagnosed Plaintiff with "attention deficit disorder [without] mention of hyperactivity," and noted that she filled Plaintiff's Adderall prescription but would be referring her to a psychiatrist for further evaluation and medication management. (Tr. 261).

On October 27, 2010, Plaintiff followed-up with Dr. Snavely. (Tr. 258-59). Plaintiff indicated that she had been unable to obtain an MRI because she had been unable to obtain insurance. (Tr. 258). She reported that she was 'on elavil in the pat which helped her pain and symptoms of depression and [was] wondering if she should go back on this…has migraines and this seemed to help with those as well." (Tr. 258). She reported "more pain in her back and neck as well..under a lot of stress and her fiancé does not understand sometimes." (Tr. 258). She was only taking "Xanax and Adderall as needed. Not every day." (Tr. 258). She reported swelling in her legs but it was "ok" on that day. (Tr. 258). She "reporte[d] anxiety and stress but deni[e]d depression." (Tr. 258). On examination, she had full range of motion in her neck, but it was painful, and she had "tender cervical paraspinal muscles." (Tr. 258). Plaintiff "walk[ed] with a normal gait," her motor strength was "intact," and she had normal muscle tone. (Tr. 259). She had "no apparent anxiety, depression, or agitation" and her affect was "normal." (Tr. 259). Her medications were continued, she was prescribed amitriptyline for headaches, and

was instructed to "elevate legs at night, could be related to varicose veins as well, try compression stockings." (Tr. 259).

On May 25, 2011, Plaintiff was taken by family members to Chambersburg Hospital and they reported she had been "increasingly agitated, disorganized, talking to herself and not taking care of [activities of daily living]." (Tr. 218). She was confused and there were concerns about suicide ideation. (Tr. 220). Plaintiff "refuse[d] to come in voluntarily," so a petition for involuntary commitment was completed. (Tr. 220). Plaintiff's mental status examination indicated mood, affect, speech, thought, insight and judgment abnormalities with auditory hallucinations. (Tr. 223). She was diagnosed with bipolar I disorder, current episode manic, severe with psychotic features, rule out stimulant abuse, and assessed a GAF of 35. (Tr. 223). Contributing factors were financial stressors and noncompliance. (Tr. 223). Plaintiff had not been taking her medications, which included Xanax and Adderall. (Tr. 222). She was treated with Zyprexa, Lithium and Klonopin. (Tr. 223). Her "daughter failed to show up for commitment proceedings," so on May 27, 2011, she was discharged against medical advice. (Tr. 216, 218).

On May 29, 2011, Plaintiff was brought back to the emergency room at Chambersburg Hospital by police. (Tr. 216). She had returned to her daughter's house, where neighbors let her in, and she "decompensated while not taking her medications and vandalized the house." (Tr. 216). She again displayed mood,

affect, thought, judgment and insight abnormalities with delusions and disorientation. (Tr. 216-17). Plaintiff was diagnosed with bipolar disorder, most recent episode manic, severe with psychotic features, and a GAF of "less than 40." (Tr. 217). She admitted to not taking her psychotropic medications and was noted to have a "history of noncompliance and questionable primary support." (Tr. 216, 217).

Plaintiff eventually "volunteered to sign herself in" and remained hospitalized through June 10, 2011. (Tr. 212). She was "medication compliant" during her stay and her "delusions and manic symptoms decreased significantly." (Tr. 212). She was instructed to follow-up with Huntingdon County mental health services. (Tr. 212). On discharge, her mental status examination was normal. (Tr. 212). She was discharged with prescriptions for Pepcid, lithium, Zyprexa, and Ativan and assessed a GAF score of 60. (Tr. 212).

On June 29, 2011, Plaintiff followed-up with Dr. Snavely. (Tr. 256-57). She informed her about her inpatient hospitalization and reported that she was staying at "Huntingdon House." (Tr. 256). She indicated that she disagreed with her bipolar diagnosis and had stopped taking lithium because she did not like the way it made her feel. (Tr. 256). She reported that she wanted to "get more Adderall" and that Huntingdon House personnel were "advising her to see a psychiatrist." (Tr. 256). Plaintiff indicated that she was using Xanax "sparingly as she admits she

was taking too much Xanax before she was admitted." (Tr. 256). She felt that the Xanax was "the only thing that really help[s] her with sleep" and that Adderall "was the only thing that ever helped her calm down and focus." (Tr. 256). She reported that she was "still in school and needs to concentrate." (Tr. 256). Dr. Snavely did not perform a musculoskeletal examination, but "encouraged [Plaintiff] to take naproxen 1-2. times daily" because she did "not feel comfortable refilling her narcotic: prescriptions given recent mental health issues." (Tr. 257). She observed that Plaintiff "[d]isplay[ed] anxiety consistently during encounter and depression periodically during encounter affect..affect appropriate to mood, depressed and dulled…showe[d] good eye contact." (Tr. 257). Dr. Snavely noted that:

> Discussed that I am not comfortable refilling any of her [medications] at this time. She needs to be seen by a psychiatrist for her further care. Her needs are outside of my expertise and I will no longer prescribe these [medications]. She has a history of cancelling appointments and being noncompliant and cannot refill these types of meds under those circumstances.

(Tr. 257).

On July 5, 2011, Plaintiff was evaluated by a licensed social worker at Universal Community Behavioral Health. (Tr. 242). She was going to school. (Tr. 242). She was observed to have pressured speech, racing thoughts, increased motor agitation, and expansive mood. (Tr. 244). She was scheduled for weekly counseling. (Tr. 245). Plaintiff's diagnoses were Bipolar I, most recent episode

manic, with psychosis and personality disorder not otherwise specified and she was assessed a GAF of 50. (Tr. 243).

On August 19, 2011, Dr. Snavely completed a medical opinion. (Tr. 234). She opined that Plaintiff had no more than moderate mental limitations in work functioning, such as understanding, remembering, and carrying out instructions, making judgments on simple work related decisions, interacting with others, and responding to changes and pressures in the work setting. (Tr. 235). Moderate limitations were defined as "a moderate limitation in this area, but the individual is still able to function satisfactorily." (Tr. 234).

On September 7, 2011, Plaintiff submitted a Function Report. (Tr. 172). She reported mental limitations, but virtually no physical limitations. (Tr. 172-79). She reported that she was living at Huntingdon House, and the form indicated that William Taylor completed the form for her. (Tr. 172). She reported that Xanax makes her sleepy. (Tr. 172). She indicated that no other medications caused side effects. (Tr. 172). She reported difficulty concentrating and completing tasks. (Tr. 165). She reported problems sleeping but no problem with personal care. (Tr. 166). She indicated that she cooked simple meals daily and could perform laundry and basic cleaning, but she needed encouragement due to her depression. (Tr. 167). She reported that she goes outside daily and can drive, but did not own a car. (Tr. 168). She indicated that her hobbies included reading, watching television, and sewing.

(Tr. 169). She indicated that she interacted with people daily at the shelter, which was "okay" but "people can frighten or make [her] uncomfortable." (Tr. 169). She indicated that she had problems with memory, completing tasks, concentration, and following instructions, but no problems lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs or using her hands. (Tr. 170). She reported that she could walk a quarter of a mile before needing to rest. (Tr. 170). She indicated no problems with authority figures but problems handing stress and changes in routine. (Tr. 171). She reported that she did not need a device to ambulate. (Tr. 171).

On September 9, 2011, she followed-up with Dr. Snavely complaining of thirty pounds of weight gain over the past three months. (Tr. 253). She was also complaining of shortness of breath, nausea, diarrhea, dizziness, heartburn, loss of appetite, and increased gas and belching. (Tr. 253). She had been off lithium for three weeks and her symptoms were unchanged, and she had insomnia over the past three weeks. (Tr. 253). On examination, she walked with a normal gait, her motor strength was intact, and she had normal muscle tone, but displayed anxiety periodically during the encounter. (Tr. 255). She was assessed to have multiple symptoms of unknown etiology and was scheduled for additional laboratory work. (Tr. 255).

On September 19, 2011, Plaintiff established care at the Huntingdon Clinic of Universal Community Behavioral Health with psychiatrist Dr. Muhammad Qamar, M.D. (Tr. 248-50, 307). Plaintiff remained enrolled in college. (Tr. 250). Plaintiff reported that she still:

> [F]eels depressed, hopeless, helpless, no motivation, no desire to do anything, tired all the time because she has not filled up her Adderall and cannot focus and concentrate, and school grades are going down, but when she was taking Adderall, she was doing good… she feels tired, sometimes feels worthless, hopeless, helpless, but denies any auditory hallucinations, visual hallucinations, and paranoia. She denies any signs or symptoms of mania. No racing thoughts, flight of ideas, and has excessive anxiety and worry for more than six months and has been feeling anxious and nervous. She denies any other problems.

(Tr. 248). However, her mental status examination was normal except for "mildly depressed and anxious" mood. (Tr. 249). She was "dressed and groomed appropriately" with "normal" motor activity. (Tr. 249). Her speech was "[n]ormal, coherent, relevant, without looseness of association" and her thought process/content was "logical." (Tr. 249). Her affect was "mood congruent" and her insight and judgment were "fair." (Tr. 249). Her "IQ measured by vocabulary and general fund of knowledge" was average and her "capacity for activities of daily living" was "good." (Tr. 249). On a test of short term memory, she "registered and recalled" three out of three words. (Tr. 249). On a test of long term memory, she knew "President Obama, President Bush, and her date of birth." (Tr. 250). On a test of concentration, she was able to spell the word "world" forwards and

backwards. (Tr. 250). Dr. Qamar diagnosed her with Bipolar I Disorder, Depressed, Severe, History of ADHD, and Anxiety Disorder not otherwise specified. (Tr. 250). He assessed her to have a GAF of 60. (Tr. 250). She was prescribed Vyvanse, Klonopin, Geodon, Elavil, and Trazodone. (Tr. 307).

On October 11, 2011, Dr. John Rohar, Ph.D., reviewed Plaintiff's file and issued a medical opinion. (Tr. 57). He acknowledged Plaintiff's inpatient hospitalizations, but noted that her mental status examination on September 19, 2011 was essentially normal, with good communication, memory, and speech, with a GAF of 60. (Tr. 56). He cited Dr. Snavely's opinion, which indicated only moderate limitations, and concluded that Plaintiff "retain[ed] the ability to perform simple routine types of work." (Tr. 56). He opined that Plaintiff had mild impairments in activities of daily living, moderate impairments in concentration, persistence, and pace and social functioning, and no episodes of decompensation. (Tr. 57). He opined that Plaintiff had some moderate limitations in understanding and memory, but "can perform simple, routine, repetitive work in a stable environment," was "capable of asking simple questions and accepting instruction," and "can function in production oriented jobs requiring little independent decision making." (Tr. 59-60).

On October 17, 2011, she followed up with Dr. Qamar and reported that:

[H]er mood is okay, but she has difficulty falling and staying asleep. Vyvanse is working great but there are still times when she cannot

focus and concentration but she is doing better in school. She feels that Vyvanse does help her. Geodon makes her tired so she is planning to take only at night. Sleeping medications does not work and wants 10 try Ambien, so I discussed with her that Ambien can cause sleep walk and she can fell and she can break her hip and she can hurt somebody with serious bodily injury, death, or disability can occur and she voiced understanding and still wants to continue.

(Tr. 303). No abnormalities were noted on mental status examination, with cooperative attitude, euthymic mood, appropriate affect, appropriate thought content, normal thought process, and fair insight and judgment. (Tr. 303). Plaintiff's diagnoses and GAF remained the same and Dr. Qamar noted that she was "doing good on her medication." (Tr. 303). He increased her Vyvanse, continued her Klonopin, Geodon, and Elavil, and substituted Ambien for trazodone. (Tr. 303).

On October 25, 2011, Plaintiff followed-up with Dr. Snavely. (Tr. 251). Plaintiff reported that she had fallen down which worsened her chronic back pain and had pain "shooting down her leg with numbness." (Tr. 251). She felt weaker on that side. (Tr. 251). On examination, she walked with a normal gait, her motor strength was intact, and she had normal muscle tone. (Tr. 252). She had a positive seated leg raise bilaterally, decreased strength with leg and knee extension bilaterally, and pain over her lumbar paraspinal muscles bilaterally. (Tr. 252). She was assessed to have unspecified backache, scheduled for an X-ray of her lumbar spine, and prescribed Prednisone and Vicodin. (Tr. 252).

On November 7, 2011, Plaintiff followed-up with Dr. Qamar. (Tr. 302). She reported that she was "stable on her medications. She has some weight gain problem, but otherwise, she is doing good. She denies any anger, irritability, or mood problems, focus and concentration is improved and anxiety is well controlled." (Tr. 302). Plaintiff's mental status examination remained normal with the same findings as her previous visit, her diagnoses and GAF score remained the same, and her medications were continued. (Tr. 302).

On December 5, 2011, Plaintiff followed-up with Dr. Qamar. (Tr. 301). Her insurance would no longer pay for Vyvanse, which was causing her "difficulty," but her mental status examination remained normal with the same findings as all previous visits, her diagnoses and GAF score remained the same, and her medications were continued except for substituting Wellbutrin for Vyvanse. (Tr. 301). On January 30, 2012, her examination, diagnoses, and GAF remained the same, but she reported Wellbutrin made her more depressed and requested Xanax and Adderall. (Tr. 300). Dr. Qamar discussed that Xanax is more habit forming, and continued her prescription of Klonopin, but discontinued Wellbutrin and added Adderall. (Tr. 300).

On November 8, 2011, an X-ray of Plaintiff's lumbar spine was normal. (264). On December 22, 2011, an MRI of her lumbar spine showed minimal degenerative disc disease with left subpedicular bulging of disc material, none of

which were creating stenosis, and induration of the deep subcutaneous tissue in the mid lumbar region. (Tr. 262).

On February 14, 2012, Plaintiff was evaluated by Dr. Carroll P. Osgood, M.D., of Allegheny Brain and Spine Surgeons, at the request of Dr. Snavely. (Tr. 265). She "reviewed a recent lumbar MRI scan dated 12/22/2011 which showed Some disc bulge at L4-5 but no major disc herniations or areas of subluxation or stenosis." (Tr. 265). On examination, Plaintiff's range of motion in her back was limited, her straight leg raise was negative, and she had good sensation. (Tr. 266). Dr. Osgood noted that Plaintiff "does have early facet joint arthritis and I believe her symptoms are primarily arthritic in nature. I see no evidence of a surgical type problem here in the lumbar spine and we tried to reassure the patient in that regard." (Tr. 266). Dr. Osgood recommended that Plaintiff "visit the pain clinic in Tyrone and try at least a couple of lumbar steroid injections" and indicated that if these were not "helpful, she is welcome to get back in touch with us in the future." (Tr. 266).

On February 27, 2012, Plaintiff followed-up with Dr. Qamar and reported:

[S]he is doing good. She is feeling lot better with Adderall, but still she feels that she has difficulty with focus and concentration and she has difficulty with her school but [it] does help her. Currently, she denies any other problems… She is very appreciative of cutting down Xanax and she is feeling lot better.

(Tr. 299). Plaintiff's mental status examination remained normal, her diagnoses and GAF remained the same, and Dr. Qamar noted that she was "doing better with Adderall but not completely satisfied" so he increased her dosage. (Tr. 299). He further noted that the "[r]est of the medications is helping her and I will continue the same." (Tr. 299).

On March 5, 2012, Plaintiff was evaluated by Dr. John Johnson, M.D. and Cynthia Casher, PA-C, RN, MMS at the Tyrone Pain Clinic. (Tr. 282). Plaintiff reported pain in her left leg and lower back. (Tr. 282). Plaintiff reported continuous pain that was aggravated by bending, climbing stairs, sitting, and standing and alleviated by lying down. (Tr. 282). She reported headaches, sleep difficulties and weakness associated with the pain. (Tr. 282). Plaintiff reported over the counter medications did not work. (Tr. 282). Plaintiff had normal gait and ambulated without a device. (Tr. 284). Plaintiff had restricted range of motion in her lumbar spine and it was painful to palpation, but her paravertebral muscles were normal, and heel/toe walk was normal (Tr. 284). She had a positive straight leg raising test on the left side and tenderness. (Tr. 284). Her muscle strength and tone were normal, her sensation was intact, and her reflexes were normal. (Tr. 284). She was scheduled for an injection and instructed to follow-up in two weeks. (Tr. 285). On March 16, 2012, she had an injection into her left sacroiliac joint. (Tr. 280-81).

On March 21, 2012, Plaintiff was evaluated by Dr. John Hume, M.D., J.D., at the request of Plaintiff's public defender in connection with criminal charges arising out of the vandalism of her daughter's apartment in between her May 2011 inpatient hospitalizations. (Tr. 267). On mental status examination, Plaintiff:

> [W]as generally pleasant and cooperative. At times she was openly tearful. Mood and affect revealed both anxiety and depression, particularly related to her current circumstances and multiple losses in her past-history. She was precisely oriented for time, place, and person. There were no current overt symptoms of psychosis, such as hallucinations, delusions, or paranoid distortions. However, she readily described both auditory and visual hallucinations and disorganized, irrational thought and behavior around the time of the circumstances with which she is charged. Cognitive functions are currently adequate. Speech, except when choked up emotionally and tearful, was of normal tone and rate. There was no pressure of speech or flight of ideas. She did not give a history of profligate or irrational spending episodes. There was no abnormal psychomotor activity. Recent and remote memory were intact. Suicidal and homicidal ideations were denied. Current judgment is adequate. Insight is partial.

(Tr. 270). Dr. Hume diagnosed Plaintiff with "Vicodin, Xanax withdrawal with acute, severe symptoms" and history of bipolar affective disorder, previously treated with lithium. (Tr. 270). Plaintiff was assessed a GAF of 55. (Tr. 270).

On April 17, 2012, Plaintiff followed-up with Dr. Qamar, and reported:

> Adderall 15 mg two times a day is not effective. She still has difficulty with focus and concentration and there are sometimes when she has crying spells and feels tired, no motivation, and no desire to do anything, but denies any suicidal thoughts, intent, or plan.

(Tr. 298). Her mental status examination remained normal, except for "mildly depressed and anxious" mood, with the same diagnoses and GAF score. (Tr. 298). Dr. Qamar increased her Adderall and order laboratory tests. (Tr. 298).

On May 2, 2012, Plaintiff returned to the Tyrone Pain Clinic. (Tr. 272). Plaintiff reported that injections worked only for a few weeks. (Tr. 272). Plaintiff's examination and subjective report was unchanged from the previous visit. (Tr. 272-75). She was prescribed Vicodin and an MRI of the lumbar spine was ordered. (Tr. 275). Dr. Johnson diagnosed lumbar disc "disease" with myelopathy, lumbago, sciatica, sacroilitis, and chronic pain syndrome. (Tr. 275).

On May 23, 2012, Plaintiff presented to a new primary care provider, Mizpah Glenny, PA-C. (Tr. 293). Plaintiff reported that she had been discharged from Dr. Snavely's care because she moved and "there was miscommunication about her request for Xanax." (Tr. 291). Plaintiff reported a history of borderline bipolar disorder, ADHD, depression, anxiety, acid reflux, chronic back pain, and weight gain, although she had not been dieting or exercising regularly. (Tr. 291). On examination, Plaintiff was "well appearing," "in no distress," and had normal mood and affect. (Tr. 292). She had intact memory, judgment, and insight. (Tr. 292). Her spine was "normal without deformity or tenderness" but she had limited range of motion due to pain. (Tr. 292). Her gait was within normal limits. (Tr.

292). Plaintiff's medications were continued and she was prescribed Vicodin. (Tr. 293).

On June 11, 2012, Plaintiff followed-up with Dr. Qamar and reported:

The patient stated that she is still getting depressed especially this month. This is around the time her daughter was killed sometime. She still has problem with focusing, but otherwise, doing fine, so I want to increase her Elavil, but she is also concerned that she is gaining lot of weight and would like to discontinue that, otherwise, she denies any suicidal thoughts. No mood swings. She would like to see if she can try to cut down further medications. We discussed with her to reduce her Klonopin, but she stated that she is not ready for that at this time. She denies any other problems.

(Tr. 297). Her mental status examination remained normal, her diagnoses and GAF remained the same, and her medications were continued except for Elavil, which was to be weaned off. (Tr. 297). Plaintiff had not completed her lab work as ordered, and indicated that she would complete it, along with an EKG. (Tr. 297).

On June 27, 2012, Plaintiff followed-up with PA-C Glenny. (Tr. 290). She requested Xanax and Vicodin, which were prescribed. (Tr. 290). She reported anxiety because June is the anniversary of when her daughter was killed and was "having relationship issues at home with her boyfriend." (Tr. 289). On examination, she had slightly anxious mood and affect. (Tr. 29). Plaintiff reported that "not working & not being active because of her back pain makes her feel more anxious, has trouble sleeping" but also indicated that "Vicodin has helped her back pain significantly." (Tr. 289).

On June 28, 2012, an MRI of the lumbar spine showed new subpedicular bulging of the disc material on the left at L5-S1, and stable subpedicular bulging of the disc material on the right at L4-5 and left L3-4. (Tr. 287-88).

On July 9, 2012, Plaintiff followed-up with Dr. Qamar and reported that "she has some difficulty with focus and concentration, not comprehending things. Her boyfriend told her in the past when she appeared to be confused, she is very irritated by this and lost her lab orders. She denies any other problems." (Tr. 296). Her mental status examination remained normal, her diagnoses and GAF remained the same, and when Dr. Qamar tried to change her medication, she indicated that she wanted to continue with the same medication, so he renewed her prescriptions and referred her for a sleep study. (Tr. 296). On July 30, 2012, she reported that she was "doing pretty good. She would like to discontinue Klonopin and she is taking only once a while so she would like to continue that. She denies any other problems." (Tr. 295). Her mental status examination was normal, her diagnoses and GAF remained the same, and Dr. Qamar noted that "as the patient is stable on her medication, I will continue the same." (Tr. 295).

On August 27, 2012, Plaintiff followed-up with Dr. Qamar and reported that she "continues to have difficulty with focusing. She stated that she feels stupid and will need new prescription for Geodon…since she is taking this at bedtime, but denies any other problems." (Tr. 294). Her mental status examination remained

normal, her diagnoses and GAF remained the same, and Dr. Qamar noted that Plaintiff was "doing good on her medication. She just has difficulty with focus and concentration, but I cannot give her more than 40 mg of Adderall." (Tr. 294). He continued her medications and order laboratory work. (Tr. 294).

On October 15, 2012, Plaintiff appeared and testified at a hearing before an ALJ. (Tr. 30). She testified that she had most recently driven a car that day. (Tr. 34). She testified that she was taking Adderall, Geodon, Ambien, and Xanax for mental impairments, Protonix for acid reflux, and Vicodin, but she did not "like to take the narcotic plus the mental pill [she was] taking…[s]o [she] only take[s] it if it's really really necessary." (Tr. 36). She was also taking "a muscle relaxer, Naproxen." (Tr. 36). She testified that her medications had caused her to gain weight. (Tr. 36). She indicated that she sees her counselor and psychiatrist once a month. (Tr. 36). She testified that she was "still trying to understand" her bipolar diagnosis and was "still having trouble focusing, concentrating," but her medications were otherwise "doing okay" and that "they finally got them set at the right ones." (Tr. 37). She testified that she had been involved with a domestic dispute with her ex-fiancé in November of 2010, but continued living with him. (Tr. 37). She reported that she could not do chores for more than "three to five minutes" because of her back and did not get a full night sleep, despite Ambien. (Tr. 38). She testified that she spends "several hours" a day on her feet, sitting

down, and laying down, but mostly "lay[s] down a lot because the back does not hurt when [she is] laying down." (Tr. 38). She testified that she could not lift over twenty pounds, could sit for a "couple hours" before needing to get up and move around, could stand for "couple hours," and could walk two blocks. (Tr. 42).

On November 2, 2012, the ALJ issued the decision. (Tr. 27). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 9, 2010, the alleged onset date. (Tr. 18). At step two, the ALJ found that facet joint arthritis; degenerative disc disease of the lumbar spine; bipolar disorder; anxiety disorder; attention deficit hyperactivity disorder; obesity; depression disorder not otherwise specified; chronic pain syndrome; sacroilitis; and personality disorder not otherwise specified were medically determinable and severe. (Tr. 18). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 19). The ALJ found that Plaintiff had the RFC to perform:

> [L]ight work as defined in 20 CFR 404.1567(b) except she can occasionally bend, balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; can never climb ladders, ropes or scaffolds; and should avoid exposure to extreme heat and cold, vibration, and hazardous conditions, such as unprotected heights and dangerous machinery. In addition, the claimant can perform only simple, routine tasks involving no more than simple, short instructions and simple work-related decisions, with few workplace changes. She cannot perform work at production rate pace, or fast-pace, assembly-line type work. Further, she can have only occasional interaction with the public, coworkers, and supervisors.

(Tr. 21). A step four, the ALJ found that Plaintiff could not perform past relevant work. (Tr. 25). At step five, in accordance with the VE testimony, the ALJ found that Plaintiff could perform other work in the national economy. (Tr. 25). Consequently, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 26).

## VI.    Plaintiff Allegations of Error

### A. The ALJ's assessment of credibility

Plaintiff asserts that the ALJ erred in assessing her credibility. (Pl. Brief at 7-14). When making a credibility finding, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P. Then:

> [T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7P; *see also* 20 C.F.R. § 416.929. "Under this evaluation, a variety of factors are considered, such as: (1) 'objective medical evidence,' (2) 'daily activities,' (3) 'location, duration, frequency and intensity,' (4) medication prescribed, including its effectiveness and side effects, (5) treatment, and (6) other

measures to relieve pain." *Daniello v. Colvin*, CIV. 12-1023-GMS-MPT, 2013 WL 2405442 (D. Del. June 3, 2013) (citing 20 C.F.R. § 404.1529(c)). "The adjudicator must also consider any observations about the individual recorded by Social Security Administration (SSA) employees during interviews, whether in person or by telephone. In instances where the individual attends an administrative proceeding conducted by the adjudicator, the adjudicator may also consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements." SSR 96-7p.

With regard to objective medical evidence, the ALJ found that "the objective findings in this case fail to provide adequate support for the claimant's allegations of disabling symptoms and limitations." (Tr. 22). "Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." 20 C.F.R. § 416.929(c)(2). Plaintiff asserts that this was an error because "Plaintiff has a history of severe back pain for which she sought treatment on numerous occasions and has been treated with aggressive narcotic pain relievers." (Pl. Brief at 8). However, the ALJ acknowledged Plaintiff's history of back pain, writing that "[t]he records show that the claimant has a long history of arthritis and back pain, the pain from which will shoot down her left leg and cause numbness and weakness." (Tr. 22). The ALJ

further explained that "the clinical signs demonstrate that the claimant has a negative straight leg raise bilaterally; good sensation; and only slightly reduced back motion to 80 degrees for forward bending, 20 degrees for extension, and 20 degrees for lateral bending." (Tr. 22). Thus, the ALJ addressed the relevant objective medical evidence regarding joint motion and sensation, and correctly noted that there were no other objective abnormalities, such as muscle spasm or motor disruption. (Tr. 22); 20 C.F.R. § 416.929(c)(2). Plaintiff's abnormal MRI, alone, does not indicate that she suffers from disabling functional limitations. *Id.*

Plaintiff does not identify any other objective medical evidence that would support her claims. (Pl. Brief at 7-14). She notes that, on multiple occasions, she complained of pain to her treating providers. (Pl. Brief at 7-14). However, as the Third Circuit has explained, complaints of pain, even when contained in medical records, do not constitute objective medical evidence:

> [T]he mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion. *Craig v. Chater,* 76 F.3d 585, 590 n. 2 (4th Cir.1996). An ALJ may discredit a physician's opinion on disability that was premised largely on the claimant's own accounts of her symptoms and limitations when the claimant's complaints are properly discounted. *Fair v. Bowen,* 885 F.2d 597, 605 (9th Cir.1989) ("The ALJ thus disregarded Dr. Bliss' opinion because it was premised on Fair's own subjective complaints, which the ALJ had already properly discounted. This constitutes a specific, legitimate reason for rejecting the opinion of a treating physician.").

*Morris v. Barnhart*, 78 Fed.Appx. 820, 824-25 (3d Cir. 2003). Moreover, as Plaintiff acknowledges, Dr. Snavely "determined that Plaintiff had *mild* disc disease" (Pl. Brief at 8)(emphasis added) and the imaging studies showed "*minimal degenerative disc disease*" with induration of tissue. (Pl. Brief at 9) (emphasis added). Thus, the ALJ properly determined that objective medical evidence did not support Plaintiff's allegations of disabling functional physical limitations.

With regard to Plaintiff's mental limitations, the ALJ relied on two physician opinions, including Dr. Snavely, Plaintiff's treating physician, who reviewed the objective medical evidence and concluded that Plaintiff could perform satisfactorily at work despite her mental impairments. (Tr. 24-25). Plaintiff did not demonstrate significant mental abnormalities except during and immediately after her hospitalizations, and she enrolled in college within a month of her discharge from the hospital. (Tr. 212, 250, 299). Dr. Qamar's records confirmed a lack of objective mental abnormalities. For instance, on November 1, 2011, Plaintiff was "stable on her medications. She has some weight gain problem, but otherwise, she is doing good. She denies any anger, irritability, or mood problems, focus and concentration is improved and anxiety is well controlled." (Tr. 302). On June 11, 2012, she still had a "problem with focusing, but otherwise, [was] doing fine," and wanted to "cut down further medications." (Tr. 297). Thus,

the ALJ properly determined that the objective medical evidence did not support Plaintiff's allegations of disabling mental limitations.

The ALJ found that Plaintiff's daily activities undermined her claims of disabling complaints because she was "able to drive and has attended school since her alleged onset date." (Tr. 24). The ALJ further explained that Plaintiff "admitted in her testimony that she can she can lift 20 pounds, sit for a couple of hours at a time, stand for a couple of hours at a time, and walk two blocks at a time." (Tr. 24). The ALJ also assigned great weight to Dr. Rohar, who opined that Plaintiff had only a "mild restriction in activities of daily living." (Tr. 24).

Plaintiff contends that it was improper to rely on these activities because they are "sporadic or transitory activity" and do not "disprove disability." (Pl. Brief at 10) (quoting *Smith v. Califano*, 637 F.2d 968, 971-972 (3d Cir. Pa. 1981)). She asserts that "[o]ccasional driving and attending classes is not evidence that Plaintiff is not experiencing pain and other symptoms caused by her physical and mental impairments." (Pl. Brief at 10-11) (citing *Smith*, 637 F.2d at 971. ("[D]isability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity."). Plaintiff further asserts that she had inadequate grades until being prescribed Adderall, and continued to have trouble focusing in school. (Pl. Brief at 11). Defendant responds that Plaintiff's focus improved on Adderall, and that she refused to change her medication when Dr.

Qamar suggested a change, "which indicates that the prescribed dose of Adderall was sufficient for Plaintiff after all." (Def. Brief at 12).

The ALJ properly addressed Plaintiff's activities of daily living. Being able to "lift 20 pounds, sit for a couple of hours at a time, stand for a couple of hours at a time, and walk two blocks at a time" is not sporadic or transitory. (Tr. 24). Contrary to Plaintiff's contention, the ALJ did not find that Plaintiff's activities of daily living indicated she was not "experiencing pain and other symptoms caused by her physical and mental impairments." (Pl. Brief at 10-11). The ALJ found that she was experiencing pain and other symptoms, but not enough to preclude all work. (Tr. 22-24). Moreover, Plaintiff's admitted ability to stand for a couple of hours at a time directly contradicts her testimony that she could not do chores for more than "three to five minutes" because of her back. (Tr. 38). "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7P. Plaintiff's activities of daily living are not sporadic, and they contradict other claims made by Plaintiff in the record, so they are proper bases to find her less than fully credible.

With regard to Plaintiff's treatment, the ALJ found that Plaintiff's:

[T]reatment has been essentially conservative in nature…Despite the claimant's allegedly severe symptoms, she has not undergone surgery, used a TENS unit or back brace, or utilized an assistive device. To address her symptoms, the claimant has only tried physical therapy, one left sacroiliac joint steroid injection, and narcotic pain medication. (Exhibit 8F). Notably, the claimant's treating neurosurgeon, Carroll P.

Osgood, M.D., noted that the claimant does not require surgical intervention, and only recommended lumbar steroid injections. (Exhibit 6F). There is no evidence that the claimant has tried lumbar injections.

(Tr. 22). "[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." SSR 96-7P. Plaintiff contends that the ALJ erred in characterizing her treatment as conservative because she has been treated with "aggressive narcotic pain relievers." (Pl. Brief at 8). Plaintiff does not explain Plaintiff's failure to obtain a lumbar steroid injection. (Pl. Brief at 7-14). Defendant responds that Plaintiff's treatment was conservative because she has not required surgery or treatment beyond pain medications and a single injection. (Def. Brief at 10-11) (quoting *Purnell v. Astrue*, 662 F.Supp.2d 402, 410 (E.D. Pa. 2009) ("[T]he use of a commonly prescribed pain medication, even a narcotic, did not remove the Plaintiff's treatment from the realm of conservative treatment"). Here, Plaintiff was essentially treated only with a commonly prescribed pain medication. Plaintiff indicated that "Vicodin has helped her back pain significantly." (Tr. 289). Thus, the ALJ properly concluded that her treatment, which primarily consisted of a stable dose of Vicodin, was conservative.

Plaintiff also argues that Plaintiff's treatment with Vicodin constitutes aggressive treatment because "Plaintiff also suffers from mental health issues which create some hesitancy in prescribing narcotics. However, even given

Plaintiff's mental health history, her treating physician still prescribed Vicodin, suggesting the severity of pain the Plaintiff suffers. Therefore, the medical evidence does support Plaintiff's allegations of back pain." (Pl. Brief at 10). However, this is not an accurate characterization of the record. Dr. Snavely prescribed a stable dose of Vicodin to Plaintiff through 2010. (Tr. 258-61). Two weeks after her June 2011 hospitalization, Dr. Snavely declined to refill Plaintiff's prescriptions pending treatment with a psychiatrist. (Tr. 256). By September of 2011, Plaintiff was enrolled in college and her mental status examination was normal except for "mildly depressed and anxious" mood and she had a GAF of 60 (Tr. 249-50). By October 17, 2011, she had no abnormalities on mental status examination, a GAF of 60, and her psychiatrist noted that she was "doing good on her medication." (Tr. 303). On October 25, 2011, Dr. Snavely again began prescribing Plaintiff Vicodin. (Tr. 252-52). Thus, Dr. Snavely did not prescribe Vicodin until Plaintiff's mental impairments essentially dissipated. Dr. Snavely did not prescribe Vicodin when it was contraindicated by her mental condition. Dr. Snavely's refusal to treat Plaintiff with Vicodin during times of mental crisis supports, rather than undermines, the ALJ's conclusion that her treatment was conservative.

The ALJ also found that Plaintiff's noncompliance rendered her claims of disabling mental limitations less credible:

Social Security Ruling 82-59 further states that when an individual does not follow prescribed treatment without a good reason a finding of not disabled will be made. Specifically, treatment notes indicate that the claimant has not been fully compliant with medications. In particular, the claimant stopped taking Lithium after her inpatient hospitalization because she did not like the way that it made her feel. (Exhibit 5F). In addition, the claimant's mental health records show that in September 2011, she had not refilled her prescription for Adderall, and therefore, was unable to focus or concentrate and her school grades were being affected. (Exhibit 4F). However, she admitted that when taking the Adderall, she was doing well, as it helps to calm her down and focus. (Exhibits 4F, 5F). The claimant's primary care provider has also declined to prescribe anxiety medication partially because the claimant's history of cancelling appointments and being noncompliant. (Exhibit 5F). This evidence demonstrates a possible unwillingness to do that which is necessary to improve her condition. It is also an indication that her symptoms may not be as severe as she purports.

(Tr. 24). Plaintiff responds that she had good reason to stop taking the medications due to cost, side effects, and frequent readjustment. (Pl. Brief at 11-12). Defendant responds that:

Plaintiff received controlled substances - both narcotics and benzodiazepines - from Dr. Snavely (Tr. 258-59). She took excessive amounts of medication and then required an extended hospitalization when she abruptly stopped taking her medication altogether. (Tr. 256-57). Plaintiff then returned to Dr. Snavely seeking additional medication, but she admitted that she disagreed with the diagnosis of bipolar disorder given at the hospital, unilaterally stopped taking her newly prescribed medication (lithium), and had not received any psychiatric treatment as was recommended at discharge (Tr. 256).
…
Plaintiff also claims that she could not afford treatment (Pl.'s Br. at 11-12); however, this claim is also not supported by the record. Although Plaintiff's insurance would not cover Vyvanse, she took Adderall for her ADHD and declined to change to a different medication, which suggests that her symptoms are not as severe as she

claims (Tr. 294-301). Indeed, if Adderall did not help Plaintiff's ability to concentrate and focus, it is likely that she would have changed her medication as Dr. Qamar suggested on two separate occasions (Tr. 294, 296).

…

Plaintiff's medication history is not complicated. Dr. Qamar prescribed medication to Plaintiff and adjusted it as needed (Tr. 294-303). Plaintiff reported "doing pretty good" in July 2012 (Tr. 295). This is not complicated and does not explain such noncompliance contrary to Plaintiff's suggestion.

(Def. Brief at 12-14).

Defendant and the ALJ correctly characterized Plaintiff's treatment as demonstrating noncompliance that was not solely explained by side effects, cost, or a complicated series of readjustments. Dr. Snavely did not only cite Plaintiff's medication noncompliance, she also noted that Plaintiff "has a history of cancelling appointments and being noncompliant." (Tr. 257). Plaintiff has provided no explanation for noncompliance with scheduled appointment times. When Plaintiff was brought to the hospital on May 25, 2011, Plaintiff reported that she had not been taking her medications, and "noncompliance" was a contributing factor to her mental state. (Tr. 223). When she was discharged and then brought back to the hospital on May 29, 2011, she admitted to not taking her psychotropic medications. (Tr. 216). There is no indication in either hospitalization that Plaintiff could not afford these medications or that they caused her side effects. (Tr. 216, 223). Plaintiff later admitted "she was taking too much Xanax before she was admitted." (Tr. 256). Dr. Hume diagnosed Plaintiff with "Vicodin, Xanax

withdrawal with acute, severe symptoms." (Tr. 270). More importantly, this noncompliance was key to Plaintiff's symptomology. During her second hospital stay, she was "medication compliant" and her "delusions and manic symptoms decreased significantly." (Tr. 212). The only time Plaintiff demonstrated any significant abnormalities on mental status examination or GAF scores lower than 55 were during or immediately after her hospitalizations, when she was noncompliant. *Supra*. Thus, the ALJ properly found that Plaintiff's noncompliance was a factor that rendered her less than fully credible.

The ALJ also found Plaintiff to be less than fully credible with regard to allegations of focus and concentration because the ALJ "did not observe any problems with focus or concentration at the hearing. The claimant was able to pay attention, respond appropriately to questions, and recite her medication list and physicians." (Tr. 24). Plaintiff asserts that this was error because it was a "limited snap shot as to Plaintiff's abilities and limitations, and it is unfair to base Plaintiff's credibility on this limited interaction." (Pl. Brief at 13). However SSR 96-7p specifically provides that the "adjudicator may also consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements." SSR 96-7p.

Moreover, even if this was an error, it was harmless, because the ALJ appropriately evaluated Plaintiff's medical evidence, course of treatment, and

activities of daily living to conclude that she was less than fully credible. Plaintiff's treating physician opined that her mental impairments did not preclude her from performing satisfactorily at work, and opined that her disc disease was only mild in severity. Dr. Rohar opined that Plaintiff's mental impairments did not preclude her from performing satisfactorily at work. Plaintiff rarely demonstrated objective findings on physical examination. She was essentially treated only with a stable dose of Vicodin. She testified that she could stand for up to two hours at a time, sit for up to two hours at a time, and lift up to twenty pounds. Substantial evidence supports the ALJ's credibility determination. Plaintiff asserts no other error in the ALJ's RFC assessment, so substantial evidence supports the ALJ's RFC assessment as well. The Court finds no merit to this allegation of error.

## B. Step Five Determination

Plaintiff asserts that the hypothetical question posed to the Vocational Expert was incomplete. (P. Brief at 14-15). However,

> [O]objections to the adequacy of hypothetical questions posed to a vocational expert often boil down to attacks on the RFC assessment itself. That is, a claimant can frame a challenge to an ALJ's reliance on vocational expert testimony at step 5 in one of two ways: (1) that the testimony cannot be relied upon because the ALJ failed to convey limitations to the vocational expert that were properly identified in the RFC assessment, or (2) that the testimony cannot be relied upon because the ALJ failed to recognize credibly established limitations during the RFC assessment and so did not convey those limitations to the vocational expert. Challenges of the latter variety (like Rutherford's here) are really best understood as challenges to the RFC assessment itself.

*Rutherford v. Barnhart*, 399 F.3d 546, 554, n. 8 (3d Cir. 2005).Here, Plaintiff asserts only that the ALJ's errors in assessing the RFC render the hypothetical incomplete. (Pl. Brief at 14).  As discussed above, the ALJ properly assessed the RFC, so there is no merit to this allegation of error.

## VII.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. *Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate.

Accordingly, it is HEREBY RECOMMENDED:

I.      This appeal be DENIED, as the ALJ's decision is supported by substantial

evidence; and

II.     The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: August 31, 2015                    _____s/Gerald B. Cohn_____
                                          GERALD B. COHN
                                          UNITED STATES MAGISTRATE JUDGE